## BEFORE THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **INSIGHT SECURITIES, INC. a Delaware corporation,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **FERNANDO HARBERER, DARIO EPSTEIN, DIEGO ALEJANDRO SAUL ROMAY, and RADO LIMITED PARTNERSHIP, a New Zealand limited partnership,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Insight Securities, Inc, a Delaware corporation ("Insight"), by and through its undersigned attorneys, and for its Complaint against Defendants Fernando Haberer ("Haberer"), Dario Epstein ("Epstein"), Diego Alejandro Saul Romay ("Romay"), and Rado Limited Partnership, a New Zealand limited partnership ("Rado"), stating as follows:

### NATURE OF THE CASE

1.    This action seeks damages resulting from of a fraudulent scheme orchestrated by Defendants Haberer and Epstein, as well as seeking both damages and declaratory relief against Defendants Romay and Rado for their involvement in a second, related fraudulent scheme also orchestrated by Haberer.

2.    The initial fraudulent conspiracy involving Haberer, Epstein and others succeeded in fraudulently inducing Insight to conduct business with them and with

various entities that they controlled that were part of Ponzi scheme directed at South America investors. As a result of this initial fraudulent scheme, Insight, as alleged below, has suffered damages well in excess of $1 million.

3. The second fraudulent conspiracy orchestrated by Haberer involves Romay and Rado and arose from a debit in Rado's account at Deutsche Bank Trust Company Americas ("DBTCA") as a result of the Ponzi scheme that Haberer, Romay and Rado fraudulently attempted to have Insight pay the debit and unjustly enrich Rado and Romay.

**JURISDICTION AND VENUE**

4. Insight is a Delaware corporation with its principle place of business in Highland Park, Illinois and at all times relevant hereto was, a securities broker/dealer duly registered with the Financial Industry Regulatory Authority ("FINA").

5. Haberer is, and at all times relevant hereto was, a citizen of Uruguay and a resident of Argentina.

6. Epstein is, and at all times relevant hereto was, a citizen of Argentina.

7. Romay is, and at all times relevant hereto was, a citizen of Argentina.

8. Rado is a New Zealand limited partnership ("Rado") with its principle place of business in Auckland, New Zealand and is wholly owned by Rado NZGP Limited, Amadeus LLC, and Bellini LLC which are non-citizens of the United States:

- The Diego Trust and the Diego Trust II are New Zealand trusts of which Romay is the beneficiary.
- Amicorp Trustees (New Zealand) Limited ("Amicorp NZ") is the trustee of the Diego Trust and the Diego Trust II.

- The Diego Trust, and the Diego Trust II, are nonjuridical entities that have the citizenship of their trustee, Amicorp NZ.
- Amicorp NZ is a New Zealand corporation with its principle place of business in Auckland, New Zealand from which it manages the Diego Trust and the Diego Trust II;
- Amadeus LLC is a Delaware limited liability company that is wholly owned by the Diego Trust NZ and is managed by Amicorp NZ;
- Rado NZGP Limited is a New Zealand corporation that is wholly owned by the Diego Trust and which has its principle place of business in New Zealand;
- Bellini LLC is a Delaware limited liability company that is wholly owned in equal percentages by the Diego Trust and the Diego Trust II and is managed by Amicorp NZ; and
- Rado, which is wholly owned by Rado NZGP Limited, Amadeus LLC, and Bellini LLC, is thus ultimately owned by the Diego Trust and the Diego Trust II.

None of the above entities have members or principle places of business in either Illinois or Delaware. Therefore, complete diversity exists.

9.      Romay is also the owner and beneficiary of the Docil Trust that owns Clodi Holdings Ltd. a British Virgin Islands company that opened one of the accounts at Insight that is a subject of this action.

10.      The ownership interest of Rado and Clodi portrayed graphically are:



11.     The amount in controversy exceeds $75,000 exclusive of interest and fees.

12.     Each of the Defendants, as described below, has conducted business for a number of years within the United States and specifically with Insight through its office in Highland Park, Illinois.

13.     Jurisdiction is, therefore, conferred on this Court by 28 U.S.C. § 1332.

14.     Each of the Defendants transacted business through Insight's office in Highland Park, Illinois; many of the conversations described herein occurred during telephone calls to Insight's owner, Carlos Legaspy ("Legaspy"), in Highland Park, Illinois; various electronic communications were sent by the Defendants to Insight at its Highland Park, Illinois headquarters; and the damages incurred by Insight were sustained in Highland Park, Illinois.

15.     Venue is, therefore, properly before the United States District Court for the Northern District of Illinois, Eastern Division.

**DEFENDANTS HABERER AND EPSTEIN'S SCHEME TO ENTICE
PLAINTIFF TO DO BUSINESS WITH ENTITIES CONTROLLED
BY THE PROMOTERS OF A PONZI SCHEME**

16.     Insight is a securities broker/dealer that conducts business throughout the United States, Mexico, Latin America, and South America.

17.     Haberer is a Uruguayan citizen and Argentinian resident who, beginning at some time prior to 2012 was associated with Biscayne Capital International, LLC ("BCI"), an S.E.C. registered investment advisor ("RIA").

18. BCI was owned by Robert G. Corttes ("R. Cortes"), Juan Carlos Cortes ("J. Cortes"), Ernesto H. Weisson ("Weisson"), and Frank Chatburn ("Chatburn") (collectively "the Biscayne Individuals").

19. Defendant Epstein, a former Argentinian Securities Commissioner, owned a company named Research For Traders, LLC ("RFT"). Epstein was until recently listed as the registered agent of RFT with an address in Miami, Florida. Prior to September 19, 2017, Defendant Epstein listed BCI's Miami, Florida address as his address as RFT's registered agent.

20. BCI had been selling to third parties certain special purpose vehicles via private placement memoranda on behalf of the following entities:

    a. S.G. Strategic Income Fund, Ltd., a private closed-ended investment exempt company incorporated in the Cayman Islands;

    b. GMS Global Step Up Note, Ltd., a private closed-ended investment exempt company incorporated in the Cayman Islands;

    c. Preferred Income Collateralized Interest, Ltd., a private closed-ended investment exempt company incorporated in the Cayman Islands; and

    d. Sentinel Investment Fund, an exempted limited liability company of unlimited duration registered as a Segregated Portfolio Company" in the Cayman Islands.

These entities (collectively "the SPV issuers") issued special purpose vehicle notes (the "SPVs") purportedly to finance various Florida real estate developments through South Bay Holdings, LLC ("South Bay"). Spyglass Investment Management, Ltd. ("Spyglass"), a British Virgin Islands company, also owned by the Biscayne Individuals, served as the investment adviser to Sentinel Investment Fund and certain other SPVs.

21.     R. Cortes and Weisson, who had formed South Bay in 1999, initially privately financed the South Bay Development and then, in 2006, started raising funds through the SPVs which, for the most part, were invested in non-registered mortgages of the South Bay Development properties.

22.     The Biscayne Individuals' common ownership of BCI, the SPVs, the SPV Issuers, and other financial service firms that were marketing the SPVs created a conflict of interest that required disclosure pursuant to the Investment Advisors Act of 1940, 15 U.S.C. §80b-1, *et seq*. Such disclosures were, however, not made.

23.     At some point in 2008, or shortly thereafter, it became apparent to the Biscayne Individuals that, as a result of the global financial crisis and the disruption of the South Florida real estate market, the South Bay development could not proceed as planned. As result, South Bay had annual negative cash flows of $12.6 million in 2010, $10.7 million in 2011, and $11.5 million in 2012.

24.     On information and belief, beginning in 2010, if not earlier, the Biscayne Individuals began running a Ponzi scheme through BCI and the SPV Issuers began using new series of the SPVs being sold by their Financial Service Firms including Biscayne Capital (BVI), Ltd. a British Virgin Island broker/dealer ("Biscayne BVI"), Biscayne Capital Uruguay, and Biscayne Capital (Bahamas) a self-clearing Bahamian broker/dealer formed in 2014, to perpetrate the Ponzi scheme.

25.     In or about 2012, the Securities & Exchange Commission ("S.E.C.") initiated an investigation of the Biscayne Individuals and BCI.

26.     In approximately 2015, when it became apparent that the S.E.C. intended to sanction both BCI and the Biscayne Individuals, Gustavo Trujillo ("Trujillo"), a person associated with one or more of the Biscayne Individuals' businesses, agreed to become the owner of a new, Cayman Islands broker/dealer named Madison Assets, LLC ("Madison"). However, the Biscayne Individuals and Haberer were the real owners and used Madison to sell the SPVs that were fueling the Ponzi scheme.[1]

27.     At the same time, the Biscayne Individuals, Trujillo, and Haberer, conspired to use the façade of two irrevocable trusts, to give the appearance that the Biscayne Individuals had surrendered all ownership interest in South Bay, the SPV Issuers, Spyglass, and the related Financial Service Firms they had controlled. Thus, when the expected S.E.C. sanctions being negotiated were actually imposed, the SPVs would appear to be wholly divorced from any ownership or control by the Biscayne Individuals when, in fact, the Biscayne Individuals would continue to control the activities of these entities and of Madison.

28.     Through Trujillo, Madison and other firms that they controlled, Haberer and the Biscayne Individuals proceeded to execute sales of the SPV knowing that the real estate projects purportedly funded by the SPVs were insolvent and had no reasonable prospect of generating returns and that funds raised were being used to

---

[1] Trujillo has been charged for his participation in this scheme in a criminal complaint filed in the United States District Court for the Eastern District of New York, Case No. 19-cr-00134.

pay "interest" to existing note holders and to distribute funds to the Biscayne Individuals.

29. The Biscayne Individuals also caused the formation of a Cayman Islands registered investment advisor ("RIA"), Total Advisors, LLC ("Total"). The plan was to have the brokers associated with BCI transfer their customers to Total, which would again give investors the impression to both current and prospective owners of the SPVs that they were dealing with an advisory firm that was neither owned nor controlled by the Biscayne Individuals.

30. Epstein shared offices with BCI and the Biscayne Individuals and was touted as the prospective buyer of Total. If Epstein was not an active participant in this fraudulent scheme, on information and belief, he was aware of the fact that: (a) the Biscayne Individuals and Haberer actually controlled Madison; (b) that the real estate projects being funded by the SPVs were insolvent; and (c) that Haberer and the Biscayne Individuals were diverting a portion of the proceeds of the SPVs to their own personal use and using the other portions of the proceeds to make interest payments on the older notes.

31. The scheme devised by the Biscayne Individuals and Haberer to enable them to continue selling new issues of the SPVs ("the fraudulent scheme") included:

A. Creating two trusts: the Vanguardia Trust to hold the SPV Issuers, certain developers and Epstein's company, RFT, and the SBH Asset Trust to hold the limited liability companies that owned the real estate and the financial services companies such as Biscayne BVI, Biscayne Holdings Limited of the Bahamas and various Biscayne Capital entities in the Bahamas, Uruguay, and Switzerland;

B. Using Gustavo Trujillo ("Trujillo") as nominee owner of Madison Assets, LLC a Grand Cayman registered broker/dealer ("Madison") to open account with various banks and financial institution as part of their Ponzi scheme; and

C. "Spinning off" the individual BCI advisors into an entity named Total Advisors, LLC, a Cayman Islands registered investment advisor ("Total").

32.    In early 2016, Raymond James & Associates, Inc. ("Raymond James"), the firm clearing trades for certain of the Financial Services Firms controlled by the Biscayne Individuals, decided to cease providing securities clearing services for foreign broker/dealers servicing customers in South America.

33.    At this time, Insight was working to expand its presence in the same market which led to DCDB Group, an international financial advisory firm that was aware of Insight's plans for expansion, to introduce Haberer to Legaspy, Insight's owner, in April 2016. Haberer introduced himself to Legaspy as one of the owners of Pitmur, a Uruguayan RIA interested in obtaining U.S. custody and execution services.

34.    At this April 2016 meeting, Haberer stated that his real intent was to find a buyer for BCI, explaining that the Biscayne Individuals had decided "to sell the financial end" of their business and to concentrate on their real estate activities.

35.    During the meeting, Haberer further represented that the Biscayne Individuals had engaged the boutique Spanish investment firm Audentia to find buyers for the various Financial Services Firms owned by the Biscayne Individuals and, as a result, Pitmur S.A. ("Pitmur") was in advanced negotiations to purchase self-clearing Biscayne Capital (Bahamas), which had custodial agreements with

various Swiss Banks including Deutsche Bank Switzerland, Safra Sarasin, Banque Pictet, UBS and Syz Bank.

36.     Haberer represented that, with Raymond James' decision to cease clearing for entities outside the United States, Pitmur needed a new domestic broker/dealer to execute trades in the United States and to act as custodian for those customer accounts

37.     Subsequent to the meeting with Haberer, Legaspy inquired of his contacts in South America regarding Pitmur. The contacts confirmed that it was owned by Epstein who was looking to incorporate Biscayne Capital's advisors into the new firm (Total) that would be managed by Audentia, a Spanish financial firm, until the sale to Epstein was completed.

38.     When Legaspy next spoke to Haberer about the proposal, Haberer represented that all of the assets related to the SPV issuers, the real estate developers, and the properties as the Financial Services firms owned by the Biscayne Individuals had been placed in "escrow" and were being held by Amicorp (BVI) Trustees ("Amicorp BVI") as trustee. Haberer further represented that Francisco Neri ("Neri") of Audentia would be managing Total while he (Haberer) and Trujillo would be running Total's back office operation until the sale to Epstein was complete. Then, Trujillo would devote his efforts to running Madison, which would undertake servicing the accounts of Total's customers that did not require U.S. execution and custodial services.

39. At no time did Haberer disclose the pending S.E.C. investigation of BCI and the Biscayne Individuals and the on-going negotiations for the imminent fine and sanction to be assessed against BCI and the Biscayne Individuals.

40. Nor, did Haberer disclose that Trujillo was merely a front for the Biscayne Individuals who would actually be controlling Madison and Total. Haberer also failed to disclose the fact that the Biscayne Individuals were the beneficial owners of the trusts into which the properties, development companies, issuers of the SPVs, and the various financial services firms owned by the Biscayne Individuals and Epstein's RFT were being placed.

41. On April 28, 2016, Legaspy met with Haberer, Neri, and approximately twenty of the Argentinian and Uruguayan advisors in Miami, Florida as part of Insight's due diligence.

42. At this time Haberer represented to Legaspy that:

   a. The Biscayne Individuals had caused the creation of two trusts, the Vanguardia Trust and the SBH Trust, with Amicorp (BVI) Trustees as the trustee of both trusts into which the Biscayne Individuals had placed their entire interest in the entities delineated in the S.E.C. Order;

   b. The Biscayne Individuals no longer had either any ownership or control in the issuers of the proprietary products or in the real estate projects underlying those products;

   c. No one at Total, including Haberer, had any knowledge of the conflicts of interest because the Biscayne Individuals had kept secret the extent of their ownership interest;

   d. Total was in negotiations with an independent buyer who would be able to interject additional capital into Insight; and

     e.   That Trujillo was the owner of Madison a registered Cayman Island broker/dealer with whom a number of Total's clients had accounts and that actively traded the proprietary products on the secondary market, also lacked any knowledge of the conflicts of interest because the Biscayne Individuals.

43.    Insight continued to conduct due diligence investigations of Total, Haberer, Epstein, Trujillo, and Madison but found nothing that contradicted any of Haberer or Epstein's representations. Nor, did Insight uncover any relationship between Haberer, Epstein, and Trujillo and the Biscayne Individuals.

44.    Relying on Haberer's misrepresentations and omissions of material facts as set forth above, Insight entered into an agreement on May 6, 2016 to provide execution and custodial services for Total, with the understanding that Total's customers would sign agreements for Total to manage their accounts and would also execute third-party powers of attorney with Insight in favor of Total so that no Insight employee would be responsible for soliciting or recommending any purchase or sale to the customers introduced by Total so that relationship would be solely one of execution and custody.

45.    Thereafter, in May and June of 2016, through telephone conversations and electronic communications with Legaspy in Highland Park, Illinois, Haberer further represented that the due diligence necessary for Epstein to purchase Total, (which included verifying the assets under management at Total and investigating both the brokers' regulatory backgrounds and their non-compete contracts with the Biscayne broker/dealers) would not be concluded prior to the expiration of the Raymond James clearing agreement with Biscayne Capital.

46.     Insight then began the onboarding of the accounts of Total's customers through Insight's representatives in its Coral Gables, Florida office.

47.     Unknown to Legaspy, Insight, and the customers who transferred their accounts to Insight after May 9, 2016, the Biscayne Individuals were the actual beneficial owners of the Vanguardia Trust and SBH Trust and, through their ownership of entities like Spyglass, were controlling the SPV issuers, Madison, the Biscayne entities, and Total.

48.     Each potential customer had to be vetted in accordance with the applicable anti-money laundering statutes, regulations, and rules by personnel in Insight's home office in Highland Park, Illinois.  Because of the potential customers' situs outside the United States, the vetting took anywhere from two to four weeks. Moreover, given the hundreds of accounts involved, the que, itself added additional weeks to the process. Thus, accounts began to trickle into Insight a month or so after the signing of the May 9, 2016 agreement with Total.

49.     Meanwhile, in July 2916, Haberer informed Legapsy, (again through telephonic and electronic communications to Legaspy in Highland Park, Illinois) that Epstein had decided to focus his efforts on the financial markets with which he had familiarity: Argentina and Uruguay. Therefore, another Cayman Island RIA named Pro Advisors, LLC ("Pro") was being established to handle the customers in Ecuador and the remaining South American countries.

50.     Haberer represented that Audentia, through Neri, would be managing Pro and that he (Haberer) and Trujillo would run the "back office" that Pro and Total

would share. Once the transition involving Epstein was complete, Haberer represented that Trujillo would then concentrate on running Madison while Haberer would join Epstein at the new firm.

51. Relying on Haberer's misrepresentations and omissions of material facts as set forth above, Insight entered into an agreement with Pro on July 22, 2016 to execute trades for its customers and to act as custodian for their accounts.

52. During the continuing onboarding process of Total and Pro's customer accounts, Legaspy met with Epstein in Buenos Aires in August 2016 where Epstein confirmed that he was buying part of the Biscayne business that included the contracts of the Biscayne Capital representatives servicing the customer accounts. After the "closing with Biscayne," Epstein explained that Pitmur would be renamed "Sur Investments." And that, Haberer would become "a junior partner" to Epstein.

53. Epstein also repeated Haberer's prior false representations that:

   a. The Biscayne Individuals had caused the creation of two trusts, the Vanguardia Trust and the SBH Asset Trust, with Amicorp (BVI) Trustees as the trustee of both trusts into which the Biscayne Individuals had placed their entire interest in the entities delineated in the S.E.C. Order;

   b. The Biscayne Individuals no longer had either any ownership or control in the issuers of the proprietary products or in the real estate projects underlying those products;

   c. No one at Total, including Haberer, had any knowledge of the conflicts of interest because the Biscayne Individuals had kept secret the extent of their ownership interest;

   d. That he was purchasing Total and was considering also making a capital infusion to Insight; and

e. That Trujillo was the owner of Madison, the contra-party to many of the orders for the purchase and sale of SPV notes being placed by Total and Pro.

54. Epstein made these representations knowing that the Biscayne Individuals were the undisclosed beneficial owners of the Vanguardia and SBH Asset Trusts and that they controlled Madison, Total, and Pro as well as the SPV issuers, the properties supposedly being developed, and the Biscayne companies.

55. Haberer and Epstein concealed these facts because they knew that if the true facts were disclosed, Insight would immediately cease all business relationships with Total, Pro, and Madison and would immediately freeze the accounts of all customers introduced by Total and Pro. Such an action would cause the immediate collapse of the on-going Ponzi scheme.

56. Based on these above-stated misrepresentations and concealment of material facts by both Haberer and Epstein, Insight continued: (a) to open new accounts for customers of both Total and Pro; (b) to accept securities for deposit into the customers' accounts; and (c) to process orders submitted by Total and Pro pursuant to powers of attorney executed by their customers.

57. Shortly after this meeting with Epstein, Insight became aware of the S.E.C. Order. BCI was censured, ordered to disgorge certain monies, and was fined. Each of the Biscayne Individuals was likewise fined and barred from association with any broker/dealer, investment advisor, municipal securities dealer or advisor, transfer agent, and any national statistical rating organization.

15

58.     Legapy immediately confronted both Haberer and Epstein, who one newspaper had identified as a director of BCI, which Epstein vehemently denied. Both Haberer and Epstein also falsely denied any involvement with the S.E.C. censured activities of the Biscayne Individuals and BCI and represented that they had been kept "in the dark" about the S.E.C. investigation and had left BCI prior to becoming aware of the S.E.C. inquiry.

59.     Haberer and Epstein further stated that the S.E.C. Order was directed against the Biscayne Individuals and BCI (which it was) and that no one other than the Biscayne Individuals had been implicated in the violations (which was also true). They also assured Legaspy that, by placing the properties being developed as well as the SPV issuers and the various financial services companies in the Vanguardia and SBH Trusts, the Biscayne Individuals had cut all ties to those entities and that this offered a "fresh start" that the two of them were taking advantage of.

60.     When Haberer and Epstein made these representations, they knew that the Biscayne Individuals were the actually beneficial owners of the Vanguardia Trust and SBH Asset Trust and continued to control the SPV and other entities that had been placed in the two trusts.

61.     Moreover, Haberer and Epstein knew that it was imperative that a U.S. broker/dealer provide execution and custody services to meet the fustomers needs to purchase and sale securities traded on the U.S. markets if the on-going Ponzi scheme to defraud Total and Pro's customers were to continue to operate.

62.     This Court can take judicial notice of the chart attached as Exhibit "A" hereto illustrating the assets of the two trusts that was filed by the liquidators of South Bay and various SPV issuers in the Chapter 15 proceeding styled, In re Northpoint Holdings (BVI) (in Liquidation), et al, Case No. 18-24659-AJC (pending the United States Bankruptcy Court for the Southern District of Florida) which graphically illustrations the contents of the two trusts:[2]

63.     When Legaspy inquired about the SPVs listed in the S.E.C. Cease-and-Desist Order, Haberer and Epstein assured him that the SPV issuers were in the process of refinancing the loans on the property to pay-off the SPVs that were coming due in late-2016 and 2017 and that a majority of the holders of the SPVs had agreed to extend the maturity of certain SPVs, all of which were meeting their interest payment obligation at coupon rates of 7% or higher.

64.     At this time, Haberer and Epstein knew that no refinancing of the SPV notes was being undertaken and that the Biscayne Individuals were engaged in s Ponzi scheme, selling new issues of the SPV to pay the interest on the existing SPV notes and to line their own pockets.

_____

[2] The consolidated matters include: In re Biscayne Capital (B.V.I.) Ltd. (in Liquidation), Case No. 18-24660-AJC, In re Vanguardia Holdings Ltd. (in Liquidation), Case No. 18-24661-AJC, In re Spyglass Investment Management Ltd., Case No. 18-24662-AJC, In re Vanguardia Group Inc., Case No. 18-24663-AJC, In re Sports Aficionados Ltd., Case No. 18-24664-AJC,  In re SG Strategic Income Ltd., Case No. 18-24665, In re GMS Global Market Step Up Note Ltd., Case No. 18-24666-AJC, In re Diversified Real Estate Development Ltd., Case No. 18-24667-AJC, In re Preferred Income Collateralized Interest Ltd., Case No. 18-24668-AJC, In re Sentinel Investment Fund SPC, Case No. 18-24669-AJC, In re Biscayne Capital Holdings Limited, Case No. 18-24670-AJC.

65.     R. Cortes has admitted in his Motion to Stay filed in <u>Diego Romay, et al., v. South Bay Holdings, LLC, et al</u>, Case No. 2018-CA-035014-CA-01, pending in the Circuit Court of the Eleventh Judicial Circuit In And For the County Of Miami-Dade County, Florida, that:

> R. Cortes, Weisson, and Mr. Cortes are also beneficiaries of the SBH Asset Trust and the Vanguardia Trust.

*Id*., Filing# 83591102 at p. 11.

66.     Throughout the remainder of 2016 and into early 2017, Epstein again confirmed to Legaspy that he was, indeed, the purchaser of Total and that neither he nor Haberer had any dealings or relationships with the Biscayne Individuals. Epstein further represented that the sale of Total was being finalized.

67.     On January 23, 2017, as part of the fraudulent scheme, Haberer provided Legaspy with a non-executed copy of the agreement whereby Epstein was purchasing Total. Shortly thereafter, Epstein falsely confirmed to Legaspy that he had signed the Total purchase agreement.

68.     Meanwhile as more accounts transferred into Insight during September and October of 2016, it became evident that the holdings in the SPVs were too large for a $100,000 broker/dealer such as Insight.

69.     While not exchange-traded, the SPV notes appeared to be actively traded on the secondary market and were being priced by Insight's clearing firm. The SPVs were also meeting all their interest obligations. Therefore, Insight had no reason to question the legitimacy of the SPVs.  However, with approximately $160 million worth of the SPV notes on its books by late-November 2016, Insight informed

Haberer, Epstein, and Trujillo[3] in December 2017 that Insight would not process any further orders to purchase the SPV notes and that the amount of SPV notes in the accounts serviced by Total and Pro at Insight had to be reduced by sales or by transferring SPV positions elsewhere.

70. After Legaspy conveyed the prohibition against buying the SPV notes and to reduce the SPV holdings in accounts at Insight, the representatives at Total and Pro seemed to be complying with this directive, selling the SPV notes and replacing them with:

> IA CAPITAL STRUCTURES (IRELAND)PLC LKD TO ISHS MSCIEM MK REG S 0.000% 07/05/35 VARIABLE RATE, CUSIP# G4718ZBP4 ("IACAP Series 32");

> IA CAPITAL STRUCTURES (IRELAND)PLC ISIN#XS1475740020 0.000% 08/16/19 VARIABLE RATE, CUSIP# G4718ZDN7 ("IACAP Series 66"); and IA CAPITAL STRUCTURES (IRELAND)PLC LKD TO ISHS MSCIEM MK REG S 0.000% 09/03/20 VARIABLE RATE, CUSIP#G4718ZBY5 ("IACAP Series 36)

Unlike the SPV notes, both of these IACAP notes were traded on the Vienna Stock Exchange.

71. There are hundreds of issues of IACAP notes on the market; however, as more of the SPV notes were sold in January and February 2017 and replaced with IACAP notes, Insight noticed that Total and Pro were only placing orders for the above CUSIP#s.

---

[3] Unlike Haberer and Epstein, Trujillo was a FINRA registered broker and, therefore, pursuant to FINRA rules, cannot be named as a defendant in a lawsuit but must be pursued in FINRA arbitration.

72.    Concerned over the new concentration in the IACAP Series 32 and Series 36 notes, Insight requested copies of the offering memoranda from the issuer. When the issuer finally complied with the request, Insight noted that the IACAP Series 36 notes being purchased by Total and Pro's customers were backed by the same assets backing the SPVs.

73.    The IACAP Series 32 offering memorandum portrayed the notes as similar to a money market, *i.e.* paying 0.25% interest per annum and invested in "short term fixed income debt securities with short duration and low volatility" that were to be held in a Citibank, London custody account.

74.    However, having been misled regarding the IACAP Series 36 notes, Insight halted all purchases in both series of IACAP notes in June 2017.

75.    The Biscayne Individuals had "mined" most individuals in Argentina, Uruguay, and Ecuador who were interested in the proprietary products and had the financial ability to purchase them.  Therefore, as Trujillo later confessed to Legaspy, the Ponzi scheme (which was also looting customer accounts at Pro, Madison, and Biscayne Capital Bahamas) had been exploiting the ability of Madison (the counterparty) to the purchase orders for the IACAP notes and the SPV sell orders transmitted to Insight (and presumably at institutions with customer accounts holding SPVs), to free-ride (not pay for purchases) with the assistance of "Deutsche Bank."

76.    During 2016, 2017, and 2018, Madison maintained accounts at DBTCA, Deutsche Bank Securities, Inc. ("DBSI"), and Deutsche Bank A.G., New York Branch

("DBNY"). Some of the accounts at some or all of these Deutsche Bank entities were, on information and belief, omnibus accounts[4] and proprietary accounts.[5]

77. Deutsche Bank had been involved with the SPV notes since their inception:

- Deutsche Bank AG, London Branch was the paying agent[6] and Deutsche Bank Luxembourg S.A. was the registrar[7] for the Diversified Real Estate Development, Ltd., GMS Global Market Step Up Note Ltd., and the Preferred Income Collateralized Interest, Ltd. notes.
- Deutsche Bank AG London Branch was also the issuing agent[8] for the Diversified Real Estate Development, Ltd. notes.
- Deutsche Bank AG, London Branch was the paying agent and transfer agent while Deutsche Bank Luxembourg S.A. was the registrar for SG Strategic Income Limited notes.

78. When Insight received a "cross-trade" (*i.e.* an order to sell the proprietary products for one or more accounts and to purchase IACAP notes with the sale proceeds for the same or other accounts) from Total or Pro, Madison was

---

[4] An account used by a broker/dealer such as Madison to maintain appropriate custody of underlying securities for the purpose of satisfying the custody obligations of the broker/dealer towards its customers.

[5] An account in which the broker/dealer uses its own funds to trade securities for its own account.

[6] Paying agents are usually banks, designated to make dividend, coupon, and principal payments to the security holder on behalf of the issuer.

[7] A registrar is an institution responsible for keeping records of bondholders and shareholders after an issuer offers securities to the public.

[8] An issuing agent is an institution that acts on behalf of the issuer of securities in distributing the securities and in realizing the proceeds thereof for the benefit of the issuer.

indicated as the required contra party for these bond transactions. Insight would first execute the sale order of the cross-trades and, only after good funds were received from the contra party (Madison), would Insight then execute the purchase portion of the order.

79.     According to Trujillo, "Deutsche Bank" would accept Madison's orders account to purchase the SPV's for its account even though Madison lacked the funds to purchase the SPVs and would extend, essentially, an interest free loan to Madison. Then, those funds from Deutsche Bank would be sent to Insight by Madison to complete the sale side of the cross-trade selling the SPVs to Madison as contra-party for the eventual purchasers. These monies would fund the purchase of the corresponding buy orders for the IACAP notes; however, once Madison, as contra-party of the sell orders, received the funds used for the purchase of the IACAP notes for its account at Deutsche Bank, rather than sending the funds to Deutsche Bank to retire the "loan", Madison would direct that the funds be sent elsewhere, such as to the Bank of New York. The Biscayne Individuals would then use these funds to pay interest on the outstanding notes, to pay employees, and to line the pockets of the Biscayne Individuals, Haberer, Trujillo, and, on information and belief, Epstein or entities that he controlled.

80.     When Madison's outstanding debit balance in its Deutsche Bank accounts risked raising red-flags, on information and belief, the Biscayne Individuals, Trujillo, and Haberer generated additional cross-trades (which created a "fresher

debit") and used part of the proceeds of the monies sent to Bank of New York, to pay down the older Deutsche Bank debit balance.[9]

81.     For example, if there was a "stale" $5 million debit, the Biscayne Individuals, Trujillo, and Haberer would engineer cross-trades for Total and Pro's customers' accounts at Insight for at least $5 million. While this would create a second $5 million debt to Deutsche Bank, after the proceeds of the sale to the other financial institution selected by Madison (for example, to Bank of New York), the Biscayne Individuals, Trujillo, and Haberer would then transfer $5 million of the proceeds to Deutsche Bank, thereby retiring the older debit balance.

82.     Since a majority of perhaps 60% the outstanding SPV were held at accounts at Insight, once Insight ceased processing orders for additional purchases of first the SPV notes and then in June 2017 of the IACAP notes, the Ponzi scheme could no longer be sustained since Biscayne Individuals had apparently completely looted the accounts being held at Madison and Biscayne Capital Bahamas. Thus, certain of the SPVs began defaulting in July 2017, a month after Insight halted further purchases of the IACAP Series 32 and Series 36 notes. All the SPV and IACAP notes were in default by the end of September 2017.

---

[9] Since DBTCA and Deutsche Bank A.G. NY are not broker/dealers, Federal Reserve Bank Regulation T, which requires cash or free assets equal to fifty-percent of the cost of the securities to be on deposit prior to purchase, is inapplicable to both entities. Likewise, since the SPV and IACAP notes are not traded on a domestic exchange and the purchases are foreign nations or entities located outside the United States, neither Regulation U or Regulation X would apply, leaving only DCTCA and Deutsche Bank A.G. NY to free ride the accounts, restrained only by its internal procedures and capital restrictions, which for entities the size of DBTCA and Deutsche Bank A.G. NY would be minor if not miniscule.

## ROMAY AND RADO

83.     Romay is a wealthy Argentinian who is the beneficiary of a number of trusts and the creator of other trusts as alleged in ¶ 5, *supra* that are designed to conceal assets from the Argentinian taxing authorities so as to avoid both the country's income tax and the Argentinian Wealth Tax, which imposes an annual percentage tax on assets held anywhere in the world.

84.     Haberer is the brother of Romay's niece's husband.

85.     Romay may have been a victim of the fraudulent scheme or he may have later joined the scheme when it became apparent that the over $40 million in SPV and IACAP notes he is believed to have owned directly or indirectly were at risk to decrease greatly in value when, as described above, Insight ceased all purchases of the SPV and IACAP notes for any accounts carried on its books.

86.     At some time prior to September of 2017, Haberer began using Rado's account at DBTCA to free-ride trades in an attempt to continue funding the Ponzi scheme, albeit at a reduced level, after Insight prohibited all purchases in the SPV and IACAP notes.

87.     Beginning sometime in early-2018, on information and belief, DBTCA began pressing Haberer (who had power of attorney over Rado's account) to pay the outstanding $12.3 million debit.

88.     The Docil Trust, one of Romay's trusts discussed *supra* that owns Clodi, had caused Clodi to open an account at Insight in January 2017.

89.     The assets to fund Clodi's Insight account came from yet another Romay controlled entity, Ponti Levine Corporation ("Ponti"). In March 2017, approximately $6.5 million in securities (including 730,000 shares of IACAP Series 32 notes valued at $741,332.30) were transferred from a Ponti Levine account at SYZ Bank in Switzerland to Clodi's account at Insight together with approximately $2 million in cash from an unnamed account at DBTCA.

90.     While the assets were transferred to Insight from a Ponti account, the Clodi account opening documents indicated that the assets were coming not from Ponti but from *Rado*.

91.     Likewise, Romay's father-in-law's business, Bralisol Associates, Ltd. ("Bralisol") and his father-in-law's brother's domestic partner, Maria De Los Angeles Aparain Borjas ("Borjas"), had also opened accounts at Insight that, like Clodi, were managed by Haberer.

92.     When Insight prohibited purchases of the SPV and the IACAP notes, the value of the notes owned by Romay and entities that he controlled risked precipitous decline if the trading of SPVs ceased.

93.     To forestall the decline in value of the SPV and IACAP notes and to prevent the immediate collapse of the previously described Ponzi scheme, Haberer and Trujillo, began using Rado's DBTCA account as if it were a proprietary Madison trading account to free-ride purchases (purchasing the notes without having the funds on deposit to pay for them) of the SPV and IACAP notes.

94.     As a result of this free-riding, a debit was generated in Rado's DBTCA account (which DBTCA also carried interest-free).

95.     Whether Romay and Rado were participants in this free-riding scheme or its victims is unknown at this time. However, the purchases initiated by Haberer using Rado's account had the effect of maintaining the appearance of a market for the $40 million worth of SPVsand IACAP notes owned by Romay and Romay-controlled entities.

96.     By September of 2017, Haberer's free-riding purchases of the SPVs and IACAP notes in Rado's DBTCA account had generated a $12.3 million debt balance in the account.

97.     By January 2018, DBTCA was pressing Haberer to send money to repay all or a material portion of the $12.3 owed to it by Rado.

98.     In response, Haberer devised a plan (with or without Romay's knowledge) to transfer assets from the Clodi, Borjas, and Bralisol accounts at Insight to pay off a material portion of Rado's outstanding $13.3 million debit to DBTCA. This would then enable Haberer to once again engage in free-riding at Deutsche Bank.

99.     Therefore, on March 8, 2018, Haberer, using a forged transfer request, had Insight (through its clearing firm, Pershing, LLC) transfer $5,139,775.40 of Clodi's assets from its account at Insight to a Clodi account at Madison.

100.    On March 15, 2018, Haberer forged instructions that caused the following transfers to be made;

A. $1,015,845.50 from Clodi's account at Insight to a Clodi's account at Madison;

B. $1.6 million from Bralisol's Insight account to a Bralisol's account at Madison; and

C. $767,000 from Borjas's account at Insight to as Borjas' account at Madison.

101.    The transfer requests for the Clodi, Bralisol, and Borjas accounts were same-name transfers to Madison (*i.e.* transfers from one account to another account with the same name). Having received what appeared to be validly signed transfer requests, Insight was required, pursuant to FINRA Rule 11870, to transfer the accounts as directed.

102.    Clodi, Borjas, and Bralisol, all subsequently asserted that they did not authorize the transfers and that they never maintained any account at Madison. If those assertions are true, then, despite Insight's transfer instructions, Trujillo and Haberer (with or without Romay's knowledge) either:

A. Took the assets out of Madison accounts of Clodi, Bralisol, and Borjas and sent the assets to DBTCA to pay down Rado's debit at that firm; or

B. Never deposited the transferred assets in any Clodi, Bralisol, or Bojas account at Madison and simply transferred the assets to Rado's account at DBTCA.

103.    DBTCA ordered the securities the transferred from the Clodi, Bralisol, and Borjas' Insight accounts to be sold and that sum, together with an additional $1,213,000 transfer from Madison, reduced Rado's DBTCA debit from $12,300,000 down to approximately $2,557,268:



104.    Before Haberer could fully execute the repayment portion of the scheme, the value of the SPV and IACAP notes collapsed.

105.    Subsequently, Haberer and, on information and belief, Romay and Rado, entered into a scheme designed to make Insight pay for a material portion of Rado's $12.3 million debt to DBTCA.

### THE SCHEME TO MAKE INSIGHT PAY FOR THE MOST OF THE RADO DEBT TO DBTCA

106.    Whether Haberer under took to initiate the transfers with or without Romay's knowledge, consent, or authorization is unknown at this time. However, what is known is that Borjas received an electronic notice on March 16, 2018 of the transfer being processed and never contacted Insight. Likewise, Bralisol was mailed a notice of the transfer from its account and never contacted Insight. Nor, did Rado.

107.    On June 27, 2018, in a letter to Insight Romay's attorneys asserted that Romay was the beneficial owner of Clodi and that Clodi's Insight account as belonging to *Rado:*

> This firm represents Diego Alejandro Saul Romay, ultimate beneficiary of the Docil Trust and beneficial owner of Clodi Holdings Ltd. ("Clodi"), which holds a brokerage account at Insight Securities, Inc. ("Insight") (account number QGU-0****5) (*the "Rado account"*).

Emphasis supplied.

108.    Clodi did not actually complain about the March 8 and March 15, 2018 transfers that had reduced Rado's DBTCA debt *until July 2, 2018* when Romay, through his attorneys demanded that, pursuant to FINRA Rule 11720, Insight initiate a reclamation request to have the transferred securities returned to Clodi's account (Borjas and Bralisol never complained of the transfers from their accounts until they filed a FINRA arbitration against Insight on 08/13/18).

109.    Since Amicorp Management Limited, and not Romay, was listed on the Clodi account documents, Insight could not initiate the reclamation request made by Romay's attorneys; however, Insight did not ignore Romay's request. In an attempt to bring all the parties involved with the transfer into a single venue, filed a complaint for declaratory relief before the United States District Court for the Northern District of Illinois Eastern Division, styled <u>Insight Securities, Inc. v. Clodi Holdings Ltd., Amicorp New Zealand, Limited, as trustee of The Docil Trust, Amicorp Management Limited, Madison Assets, LLC, and Deutsche Bank Securities, Inc.</u>, Case No. 18-cv-04925 ("the declaratory action"). The declaratory action sought a declaration as follows:

A. Whether the July 2, 2018 demand by the attorney's for Romay that Insight institute a FINRA Rule 11720 reclamation produce is a valid demand under that rule; and/or

B. Whether the March 8 and March 15, 2018 transfers were authorized by Clodi or its actual or apparent agents;

C. Whether Insight had the right to rely on the March 8 and March 15, 2018 transfer request even if they were unauthorized forgeries.

D. If the March 8 and March 15, 2015 transfers were not authorized by Clodi or its actual or apparent agents, whether Insight has a right to indemnity from Madison and Deutsche Bank, jointly or severally, for any cost and damages payable to Clodi.

*Id*. at p.11

110.   The declaratory action would have brought into one venue all the involved entities (a number of which are not FINRA registrants) and would have resolved all the issues regarding the transfers processed by Insight for Clodi's account. However, upon being served with process, Romay's attorneys withdrew the reclamation request on August 6, 2018, stating in pertinent part:

> We now withdraw the Request, as Mr. Romay, through Clodi, prefers to pursue his claims against Insight in FINRA arbitration. The withdrawal of the Request renders the complaint moot, and we therefore request that Insight voluntarily dismiss the Complaint on this basis. *See Associated Indus. Ins. Co., Inc. v. Sta l Cowen Crowley Addis LLC*, No. 15 C 4296, 2017 WL 3088142, at *2 (N.D. Ill. June 2, 2016).

Emphasis in original.

111.   Thus, Romay elected not to proceed in the declaratory action where all parties were amenable to the court's jurisdiction and within the reach of the discovery provided by the Federal Rules of Civil Procedure so that the truth of what occurred could be determined.

112.   Meanwhile DBTCA filed an action in the United States District Court for the Southern District of New York styled <u>Deutsche Bank Trust Company</u>

Americas v. Rado Limited Partnership, Case No. 18-cv-06768 ("the New York Case") to collect the remaining debt balance in Rado's DBTCA account.

113.    Romay had Rado file a counterclaim in the New York Case *seeking to negate the entire $12,300,000 debt* to DBTCA, meaning that DBTCA would have *to repay Rado* the approximately $8,531,000 transferred from the Insight accounts of Clodi, Bralisol, and Borjas.[10]

114.    In furtherance of that plan, Romay had Clodi, Bralisol, and Borjas file the following two FINRA arbitrations against Insight and, its owner, Legaspy, alleging that the afore-mentioned transfers were unauthorized:

A.   Maria De Los Angeles Aparain Borjas and Bralisol Associates, Ltd. v. Carlos Legaspy, Insight Securities, Inc., and Pershing LLC, FINRA Arb. No. 18-02781 ("The Borjas Arbitration") seeking $2,376,000 in damages; and

B.   Clodi Holdings, Ltd. v. Carlos Legaspy, Insight Securities, Inc., and Pershing LLC, FINRA Arb. No. 19-00137 ("the Clodi Arbitration") seeking $6 million in damages.

115.    If Clodi, Borgas, and Bralisol prevail in the FINRA arbitration against Insight and they would receive the $8,531,000 transferred to Madison. And, if Radovloses it counterclaim in the New York Case, it would have still received the benefit of the $8,531,000 of assets transferred from Clodi, Borgas, and Bralisol's Insight accounts since DBTCA is only seeking payment of the remaining balance after it had already apply this $8,531,000 to Rado's outstanding debit balance. Insight would then effectively be paying $8,531,000 of Rado's debt to DBTCA.

---

[10] As well as the additional $1,213,000 transferred by Madison and which actually belongs to the Madison LLC liquidators.

116.    If Clodi, Borjas, and Bralisol prevail in the FINRA arbitration and Rado prevails on its counterclaim against DBTCA in the New York Case, Rado will have avoided the debit entirely and would receive its previous losses *plus the funds transferred* from Insight restored to its DBTCA account. Clodi, Borjas, and Bralisol would *also receive the value of the transferred assets restored to them* by any award against Insight.

117.    Regardless of which outcome is eventually realized in the New York Case, win or lose, Haberer, Romay and Rado's plan would have the effect of turning the $8,531,000 into $17,062,000 by having Insight repay Clodi, Bralisol, and Borjas while Rado's DBTCA debit is reduced by that same amount or Rado's DBTCA account is restored to an amount that includes the transferred funds.

118.    A material aspect of the scheme is the fact that, since Romay and Rado did not have accounts at Insight and thus did not sign arbitration agreements, any claim to prevent Romay and Rado from being unjustly enriched cannot be brought in that venue. Likewise, because Clodi, Bralisol, and Borjas signed arbitrations. Agreements, they cannot be made part of any action outside of that venue. Hence, the need for the declaratory relief being sought herein.

## COUNT I
### (Fraud Against Haberer and Epstein)

119.    Plaintiff realleges ¶ 1 thru ¶ 82, above, as ¶ 119 of this, Count I, as though fully set forth herein.

120.    As herein previously alleged, Haberer and Epstein made the following misstatements of material facts to Insight:

    a. The Biscayne Individuals had caused the creation of two irrevocable trusts, the Vanguardia Trust and the SBH Asset Trust, into which the Biscayne Individuals had placed their entire interest in SPV issuers, the properties being developed, and the financial service firms marketing the SPV notes;

    b. The Biscayne Individuals no longer had either any ownership or control in the issuers of the proprietary products or in the real estate projects underlying those products;

    c. No one at Total, including Haberer and Trujillo, had any knowledge of the conflicts of interest because the Biscayne Individuals had kept secret the extent of their ownership interest;

    d. Total was in negotiations with an independent buyer who would be able to interject additional capital into Insight;

    e. That Trujillo was the owner of Madison, a registered Cayman Island broker/dealer with whom a number of Total's clients had accounts and that actively traded the proprietary products on the secondary market, also lacked any knowledge of the conflicts of interest because the Biscayne Individuals; and

    f. That the SPV issuers were in the process of refinancing the previously outstanding SPV note.

121. As herein previously alleged, Haberer and Epstein made the following omissions of material facts:

    a. That the Biscayne Individuals were using the proprietary products to run a Ponzi scheme;

    b. That Haberer, Trujillo, and Epstein were active participants in this Ponzi scheme;

    g. That Haberer, Trujillo, Epstein and the Biscayne Individuals, through Total, Pro, Madison, and Biscayne Capital (Bahamas), were free-riding purchases in various issues of the SPV and IACAP notes through Madison and Biscayne Capital (Bahamas) accounts at DBTCA and Deutsche Bank A.G. New York Branch; and

    c. That the Biscayne Individuals and Haberer were the actual owners of Madison.

122. When Haberer and Epstein made each if the misrepresentations set forth in ¶ 120, above, at the times herein previously alleged, they knew that those statements were false.

123. When Haberer and Epstein concealed each of the material facts set forth in ¶ 121, above, they knew that disclosure of anyone of those facts would cause Insight not to do business with Total and Pro, or after having begun conducting business, would have immediately ceased such business.

124. Haberer and Epstein made the misstatements ¶ 120, above and concealed omissions the material facts alleged in ¶ 121, above, with the intent that Insight rely on those misrepresentations and omissions of material facts.

125. Insight justifiably relied on the material misrepresentations and omission of material facts alleged in ¶ 120 and ¶ 121, above, and did so to its detriment.

126. As a direct and proximate result of Insight's justifiable reliance on the material misrepresentations and omissions of material fact, Insight has suffered in excess of $1 million in compensatory damages.

WHEREFORE, Insight prays that judgement be entered against Haberer and Epstein, jointly and severally, in the amount of at least $1 million in compensatory damages and $3 million in punitive damages.

## COUNT II
## (Declaratory Relief Haberer and Epstein)

127.    Plaintiff realleges ¶ 1 thru ¶ 82 and ¶ 120 thru ¶ 126, above, as ¶127 of this, Count II, as though fully set forth herein.

128.    An actual controversy within the meaning of 28 U.S.C. § 2201 exists between Insight on the one hand and Haberer and Epstein on the other.

129.    Over 100 customers of Total and Pro have filed the following arbitration claims against Insight before FINRA, alleging that their purchases of the SPV and IACAP notes in their accounts at Insight were unsuitable:

- <u>George Maalouf Georges, Alma Group Consultants Corp, Magy Georges Mehana, et al. vs. Insight Securities, Inc.</u>, FINRA Arb. No. 18-02934 (the "Georges Arbitration)

- <u>Ada Serena Cordova Armijos, Aida Isabel Vaca Lara de Duran, et al. vs. Raymond, James & Associates and Insight Securities, Inc.</u>, FINRA Arb. No. 18-02934 (the "Armijos Arbitration"); and

- <u>Alberto Jose Nieves and Gladys Veronica Anton vs. Carlos Legaspy, Insight Securities, Inc., and Pershing, LLC</u>, FINRA Arb. No. 19-00474 (the "Nieves Arbitration").

130.    The Claimants in the Georges, Armijos, and Nieves Arbitrations are seeking in excess of $20 million in damages from Insight for the purchases of SPV and IACAP notes.

131.    All of the Claimants in Georges, Armijos, and Nieves Arbitrations were introduced to Insight by either Total or Pro, both of which had power of attorney to enter orders for the purchase and sale of securities in their respective customer accounts.

132.    But for Haberer and Epstein's misrepresentations and omissions of material facts, Insight would not have transacted any business with the Claimants in the Georges, Armijos, and Nieves Arbitrations.

133.    In addition to the amount of damages being claimed in the Georges, Armijos, and Nieves Arbitration, Insight is being forced to pay member fees to FINRA related to these arbitrations and has already incurred tens of thousands of dollars in attorney's fees defending against those claims.

134.    Moreover, pursuant to its clearing agreement with Pershing, LLC, Insight is required to indemnify Pershing for an adverse award entered in favor of any customer introduced to Pershing by Insight and all of Pershing's fees (including attorney's fees) expended in those arbitrations.

135.    All of the Claimants in the Georges, Armijos, and Nieves Arbitrations were introduced to Pershing by Insight.

WHEREFORE, Insight prays that this Court declare that Haberer and Epstein are jointly and severally liable to Insight for:

A.  Any adverse award entered against Insight in the Georges, Armijos, and/or Nieves Arbitration;

B.  Any sums that Insight is required to pay to Pershing to indemnify Pershing as a result of the filing of the Georges, Armijos, and Nieves Arbitrations, including any adverse award entered therein; and

C.  All costs, including attorney's fees, incurred by Insight in the Georges, Armijos, and Nieves Arbitrations.

## COUNT III
### (Fraud – Haberer)

136.    Plaintiff realleges ¶ 1 thru ¶ 126, above, as this, ¶ 136 of this, Count III, as though fully set forth herein.

137.    Haberer has stated to Romay and Legaspy that he forged the transfer requests for the Clodi, Bralisol, and Borjas accounts that he submitted to Insight. Legaspy then reported Haberer to and the Federal Bureau of Investigation.

138.    If, in fact, Haberer submitted the transfer instructions for the Clodi, Bralisol, and Borjas accounts to Insight without the knowledge or consent of the accountholders, he did so with the intent for Insight to rely on the forged transfer requests.

139.    Insight reasonably relied on those transfer instructions to its detriment, *i.e.* by transferring the account assets pursuant to those instructions.

140.    As a result of Insight's justifiable reliance on the transfer instructions, Insight has suffered monetary damages.

WHEREFORE, Insight prays that judgment be entered for Insight in the amount of any award entered against Insight (or for which Insight is required to indemnify Pershing) in the Clodi and Borjas Arbitrations, including all attorney's fees, FINRA fees, and costs or, if this matter is resolved before those arbitrations, a declaration that Haberer is liable to Insight for those amounts.

## COUNT IV
### (Conspiracy to Fraud – Haberer, Romay and Rado)

141.    Plaintiff realleges ¶ 7 thru ¶10 and ¶ 83 thru ¶ 118, as ¶ 141 of this, Count IV, as though fully set forth herein.

142.    On information and belief, Rado was the actual or beneficial owner of the securities in Clodi's account with Insight.  Therefore, regardless of how the March 8 and 15, 2018 transfers of securities from Clodi's account at Insight were effected, Rado was the actual or beneficial owner of the securities and it received the benefit of those two transfers since the proceeds of the sale of the securities reduced Rado's debt to DBTCA by $$6,155,000.

143.    Thereafter,  Haberer, Romay, and Rado entered a conspiracy to defraud Insight that involved retaining for Rado the benefit of the reduction in Rado's DBTCA debit and to file an arbitrations before FINRA seeking to hold Insight liable for those transfers by initiating a FINRA arbitration in Clodi's name to recover the $6,155,000 value of the securities transferred while simultaneously retaining the benefit of the sale of those securities by DBTCA to reduce Rado's debt with than entity.

144.    As a result of this fraudulent scheme engineered by Haberer, Romay, and Rado, Insight has incurred damages in excess of $75,000.

Wherefore, Plaitinff prays that judgement be entered against the defendant's, jointly and severally, for compensatory damages suffered by Insight as a result of the Defendants' actions as well as appropriate punitive damages.

## COUNT V
### (Declaratory Relief – Rado and Romay)

145.    Plaintiff realleges ¶ 7 thru ¶10 and ¶ 83 thru ¶ 118, above, as ¶145 of this, Count V, as though fully set forth herein.

146.    An actual controversy within the meaning of 28 U.S.C. § 2201exists between Insight on the one hand and Romay and/or Rado on the other.

147.    As herein previously alleged, Amicorp Management Limited, the entity that opened Clodi's Insight account, indicated on the transfer form submitted to Insight that the assets funding Clodi account at Insight were being transferred from Rado's account.

148.    As herein previously alleged, Romay's attorneys admitted that Clodi's account at Insight really belonged to Rado.

149.    Romay, signed the Uniform Submission Agreement in the Clodi Arbitration that enabled Clodi to file its Statement of Claim against Insight.

150.    If Clodi was merely a nominee or front for Rado or both Clodi and Rado were nominees or fronts for Romay, then regardless of the efficacy of the previously alleged transfer instructions provided by Haberer for the March 8, 2018 and March 15, 2018 transfer the assets were transferred from: (a) either Rado's account to another Rado account; or (b) from one Romay account to another Romay account.

WHEREFORE, Insight prays that this Court declare that:

    a.  Romay was the actual owner of both the Clodi account at Insight and Rado's account at DBTCA and that the transfer of the assets in Clodi's account at Insight was a transfer from Romay to another Romay account; or

b. That Rado was the actual owner of the Clodi account at Insight and that the transfer of the assets in Clodi's account at Insight was a transfer from one Rado account to another Rado account; or

c. In the event that the Clodi Arbitration concludes prior to judgment, that Romay is liable to Insight in the amount of any award entered against Insight (or for which Insight is required to indemnify Pershing) in the Clodi and Borjas Arbitrations, including all attorney's fees, FINRA fees, and costs.

## COUNT VI
### (Negligence – Romay)

151. Plaintiff realleges ¶ 7 thru ¶10 and ¶ 83 thru ¶ 118 as ¶ 151 of this, Count VI, as though fully set forth herein.

152. Romay knew that Amicorp Management Limited, Clodi's sole director, had provided Total with authority to enter trades for Clodi's account.

153. On information and belief, Romay either did not appoint a Trust Protector pursuant to New Zealand law or appointed himself to that position.

154. Because Romay had created the Docil Trust and Clodi to evade Argentinian tax laws, Romay refrained from having duplicate notices and account statements for Clodi's Insight account sent to his email address or to his regular mail address.

155. On information and belief, purusant to the agreement appointing Amicorp Management Limited as Clodi's sole director relieved, Romay did not have a reasonable belief that Amicorp Management Limited would be timely reviewing the either the notices sent to Clodi and the account statements regarding its Insight account.

156.     Romay knew that Haberer, pursuant to the POA provide for the Clodi account had knowledge of all the vital information for Clodi's Insight account.

157.     Moreover, Romay knew that Clodi's account agreement with Pershing stated in pertinent part:

> 7. Orders and Statements
> Reports of the execution of orders and statements of my (our) account shall be conclusive if not objected to in writing, the former within two days and the latter within ten days, after forwarding by you to me (us) by mai1 or otherwise.

158.     Romay knew that because he was not receiving electronic or hard copies of the Clodi account statements or notifications that no one could provide the timely, required notice required by the above account agreement. Thus, it was entirely foreseeable to Romay that Haberer or some other person at Total could take unauthorized actions that would not be discovered within the time period specified in the account agreement.

159.     Romay's action failing to receive either electronic or hard copies of the notices and statements or to have someone timely review the notices for Clodi's Insight account was negligent, if not reckless.

160.     The assets transferred from the Clodi, Bralisol, and Borjas accounts were not sold until March 20, 2017.

161.     Notices regarding the first transfer request submitted on March 8, 2018 would have been discovered by Romay had he acted with the diligence required of a trust protector  and not only would the assets transferred on March 9, 2018 not been

sold, but the March 15 ,2018 transfers for Clodi, Bralisol, and Borjas would not have been processed.

162.    That someone may attempt an unauthorized action regarding Clodi's Insight account was entirely foreseeable hence the requirement that customers review account notifications and statements on a timely basis.

163.    That losses to Clodi's accounts and to other accounts related to Romay were a foreseeable result of Romay's negligence as alleged herein.

164.    Romay's negligence as herein allege was a direct and proximate cause of damage suffered, and to be suffered, by Insight.

WHEREFORE, Plaintiff prays that:

A.  Judgement be entered for Insight and against Romay for all costs, fees, and awards entered against Insight in the Clodi, Bralisol, and Borjas Arbitrations and for any indemnity owed by Insight to Pershing as a result of those arbitrations; or

B.  Should this matter conclude prior to Clodi, Bralisol, or Borjas Arbitrations that this court declare that Romay is liable for all costs, fees, and awards entered against Insight in the Clodi, Bralisol, and Borjas Arbitrations and for any indemnity owed by Insight to Pershing as a result of those arbitrations.

## COUNT VII
### (Unjust Enrichment – Romay and Rado)

165.    Plaintiff realleges ¶ 7 thru ¶10 and ¶ 83 thru ¶ 118 as ¶ 165 of this, Count VII, as though fully set forth herein.

166.    Romay is the beneficial owner of Rado and therefore Roamy and Rado received the benefit of the $8,531,000 transferred to Rado's DBTCA from the Insight accounts of Clodi, Bralisol, and Borjas.

167.    Romay's and Rado's continued retention of the benefit of this $8,531,000 transferred to Rado's DBTCA from the Insight accounts of Clodi, Bralisol, and Borjas violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Insight prays that judgement be entered against Romay and Rado, jointly and severally, for $8,531,000, plus interest, so that insight can restore to the Clodi, Bralisol, and Borjas accounts the value of the securities transferred from them that unjustly benefited Romay and Rado.

April 29, 2019                                                Respectfully Submitted

                                                             _____
                                                             One of Plaintiff's' attorneys

Nicholas P. Iavarone, Esq.          Laurence M. Landsman, Esq.
The Iavarone Firm, P.C.             Marcia F. Przeslawski, Esq.
33 North LaSalle, Suite 1400        The Landsman Law Firm
Chicago, IL 60602                   33 North LaSalle, Suite 1400
(312) 63 7-9466                     Chicago, IL  60602
(800) 417-0580 (fax)                (312) 251-1144
                                    (312) 251-1147 (fax)